# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GREEN 2023 HONDA HR-V, NEW HAMPSHIRE REGISTRATION 5154753, VIN 3CZRZ2H58PM705896, AND A RED 2023 DODGE CHARGER, MAINE REGISTRATION 7120ZM, VIN 2C3CDXHG0PH566312, EACH CURRENTLY LOCATED AT THE SACO POLICE DEPARTMENT'S SECURED GARAGE BAY | Case No. 2:24-mj-54-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Ryan Hatch, being first duly sworn, hereby depose and state a follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search and seizure of physical material and electronically stored information, as particularly described in Attachment B, within (1) a green 2023 Honda HR-V, bearing New Hampshire Passenger Car Registration Number 5154753, bearing VIN 3CZRZ2H58PM705896 (the "Subject Vehicle"), and (2) a red 2023 Dodge Charger, bearing Maine Registration Number 7120ZM and VIN 2C3CDXHG0PH566312, (the "Target Vehicle") each currently located at Saco Police Department's secured garage, a description of which is contained in Attachment A.

2.  I am a Detective with the Saco Police Department in Saco, Maine and a graduate of the Maine Criminal Justice Academy. I have been a Detective for the past

eight years and during that time I was assigned as Special Agent with the Maine Drug Enforcement Agency from March of 2015 to April 5, 2019. I am currently assigned as a general Detective investigating serious felony crimes to include violent crimes and serious property crimes as well as other violations of Maine Criminal Law.

3.  As of October 2022, I was assigned as a Task Force Officer ("TFO") for the Federal Bureau of Investigation Safe Streets Task Force/ Southern Maine Gang Task Force. The task force focuses on drug trafficking, gun crimes, and other violence involving organized crime. I have also applied for search warrants and/or assisted in the execution of search warrant involving forensic extractions of digital evidence. I have previously investigated a crime where an Infotainment system of a vehicle was searched and examined by trained forensic analysts.

4.  This affidavit provides information sufficient to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5.  As detailed below, there is probable cause to believe that the Target Subjects (as defined below) committed violations of federal law, including 21 U.S.C. §§ 841, 846, and 18 U.S.C. § 924(c), and that evidence of those crimes is located within the Subject and Target Vehicles, including the infotainment and telematics systems, is as follows:

6.  I know from my participation in this investigation that at about 11:56 a.m. on February 9, 2024, the Saco Police Department received a report of shots fired between two vehicles in the area of Temple and Elm Streets in Saco. Moments later, a

crash at the intersection of North and Elm Streets in Saco was reported. I and other members of law enforcement investigated the crash. From that investigation, I learned the following information.

7. The Subject Vehicle ran a red light and crashed into the driver's side of a second vehicle. As a result of the impact, the Subject Vehicle crashed into the front of an Old Orchard Beach school bus with children aboard. At least one of the passengers on the school bus took photographs of the occupants of the Subject Vehicle fleeing the scene. Law enforcement obtained additional video and photographs from the public depicting the Subject Vehicle and its occupants.

8. According to witnesses to the accident, and corroborated by video obtained by law enforcement, following the crash, three Hispanic males, later identified as Target Subjects JOSHUA ESTRADA, a/k/a "Mac," YANCARLOS ABRANTE, a/k/a "Glizzy," and JASON JOHNSON-RIVERA, JR. fled the scene of the accident on foot. In the videos obtained by law enforcement, ABRANTE is depicted wearing an olive drab green sweat suit with the hood over his head, ESTRADA is depicted wearing a white Carhartt sweatshirt and black pants and JOHNSON-RIVERA is depicted wearing a black sweat suit and a black Nike balaclava (ski mask). JOHNSON-RIVERA appeared to have an injury to his right arm that was bleeding, and he limped as he ran.[1] I have reviewed additional video showing the Target Subjects walking towards a black Honda

---

[1] It should be noted that images of the individuals captured by citizen video recordings were provided to the news media and broadcast to the public, which aided in their identification as described further below.

Pilot with tinted windows. I believe that the Target Subjects ultimately left the scene in this Honda Pilot.

9. Officers on the scene of the accident reported that the air bags of the Subject Vehicle had deployed, and that they had found what they believed to be blood stains inside the rear passenger compartment and on the pavement outside of the Subject Vehicle. The Subject Vehicle was subsequently seized and impounded, and several days later, on about February 13, 2024, searched pursuant to a judicially authorized warrant. During the search, I recovered, on the floor of the rear passenger compartment behind the driver's seat, a loaded black Smith and Wesson M&P Shield 9 mm handgun, with a chambered 9 mm Luger round, and two additional rounds remaining in the magazine. On the floor of the driver's compartment, I located a gold-colored digital scale coated in white-powdery residue, consistent with residue left from weighing out and/or mixing controlled substances for further distribution. In addition, I recovered a fully loaded magazine from a gray backpack in the rear passenger compartment, as well as a sandwich bag containing twenty-one lose 38 special Winchester rounds. The backpack was also found to contain court paperwork containing conditions of release for a juvenile. Among those conditions was a no-contact provision listing ABRANTE as one of a number of individuals. I also recovered two cellular phones from the Subject Vehicle.

10. Quickly following the accident, I investigated the area of Temple and Elm Streets where the shooting was reported. In the north bound lane in the vicinity of 51 Elm Street, I observed shattered glass on the pavement, four fired 9 mm shell casings, and one bullet projectile.

11. I reviewed video of the shooting captured by an exterior camera of a nearby business. The video showed that at approximately 11:55 a.m. on about February 9, 2024, the Target Vehicle stopped at the red light at the intersection of Elm, Temple, and, Scamman Streets and Thornton Avenue in the northbound left turn only lane. The Subject Vehicle then drove past the Target Vehicle along the passenger side.

12. I have reviewed additional video recorded by the security camera of a private residence on Elm Street on February 9, 2024, which depicts ESTRADA driving the Subject Vehicle. The occupants of the Target Vehicle are not identifiable from the video. The video shows that the rear passenger window of the Target Vehicle was still intact at the time that it passed by the residence (before it reached the intersection). Audio recorded by the Elm Street residents reveals that seven shots were fired during the incident.

13. I have reviewed additional video provided by the public of the incident, showing the Target Vehicle driving through the intersection shortly after the crash happened with a broken-out rear passenger side window, and then fleeing the area up North Street.

14. I have reviewed videos taken by the school bus camera. According to the videos, after the Subject Vehicle crashed into the school bus, ABRANTE exited the front passenger seat first. ABRANTE was followed by ESTRADA out of the same door. JOHNSON-RIVERA then existed from the rear driver's side door.

15. From these videos, I was able to identify the license plate of the Target Vehicle. Based on the license plate, I learned that the Target Vehicle was an Enterprise rental car. I obtained information from Enterprise that assisted me in locating the

Target Vehicle at an address in Standish, Maine. When officers visited that location, they observed that the Target Vehicle was concealed with a tarp. An individual who resided at the location stated that a person he knew, Target Subject ANTHONY BUTLER, arrived at the residence between 1:00 and 2:00 pm on February 9, 2024, and stated that he needed to have some work done on the Target Vehicle and asked to leave it there. Officers had the Target Vehicle towed to the Saco Police Department. The passenger side of the Target Vehicle had five apparent bullet impacts visible, the rear passenger side window was broken, and the front passenger side window was cracked.

16. On about February 13, 2024, I executed a judicially authorized search warrant on the Target Vehicle. During that search, I recovered two projectiles from the passenger side of the Target Vehicle. I located a credit check for BUTLER in the glove compartment of the Target Vehicle. I have reviewed BUTLER's criminal history, from which I learned that BUTLER has been previously convicted of drug possession and assault.

17. I learned from a fellow Saco officer who met with a confidential source of information ("SOI-1")[2] on about February 10, 2024, that SOI-1 picked up the Target Subjects in SOI-1's black Honda Pilot at ESTRADA's request. SOI-1 knew ESTRADA to be from New Bedford, Massachusetts. SOI-1 stated that SOI-1 did not recognize the other two individuals who were with ESTRADA, or if either of them were injured.

---

[2] SOI-1 has no criminal convictions. It is believed that SOI-1 decided to provide information to law enforcement because SOI-1 had some limited involvement in the events described above, and wanted to further minimize SOI-1's role in events in order to avoid criminal charges.

18.  I have learned from the officers at the New Bedford Police Department that ESTRADA and ABRANTE are believed to have been trafficking drugs from New Bedford to Maine, and that ESTRADA and ABRANTE were recently staying with SOI-1 in building 8 of the Pinebrook Terrace apartments in Old Orchard Beach, Maine. I further learned that ESTRADA and ABRANTE are verified members of the Gangster Disciples street gang.[3]

19.  I have learned from a fellow Saco officer who met with an individual who would not provide his name ("Anonymous Source-1" or "AS-1") that AS-1 had seen media coverage of the shooting, and wished to provide information. AS-1 stated that he knew the individual in the "white shirt," whom I believe to be ESTRADA. AS-1 stated that AS-1 had purchased heroin from this individual, and that the individual lived in the "Pine Crest Apartments" near building 8, which I believe to be the Pinebrook Terrace apartments in Old Orchard Beach.

20.  On about February 12, 2024, I received a tip from the owner of Team Spirit, a store at the Maine Mall, who reported seeing the Target Subjects in her store on the afternoon of February 8, 2024. The owner reported that the Target Subjects were wearing clothing identical to the clothing they wore in the images made available to the public following the shooting, and that they were seeking to buy Nike ski masks, which

---

[3]   The Gangster Disciples street gang was formed in Chicago, Illinois in the mid-1960s. It is structured like a corporation and led by a Chairman of the Board. The Gangster Disciples membership is estimated to be between 25,000 and 50,000, the majority of whom are Black males from the Chicago metropolitan area, though the Gangster Disciples are known to be active in 110 cities in 31 states.

the store did not carry. The owner then watched the Target Subjects leave her store and enter Foot Locker.

21. I contacted the manager of the Foot Locker. He was able to locate video of the Target Subjects entering the Foot Locker at approximately 12:35 pm on February 8, 2024. I reviewed the video, and recognized the individuals depicted as the Target Subjects. ESTRADA purchased underwear at the Foot Locker using cash and the customer account of "Naiomi Estrada" whom I know to be ESTRADA's mother, based on information I reviewed in law enforcement databases.

22. I have compared law enforcement photographs of the Target Subjects against their likenesses as depicted in the various videos described above, and I have concluded that the Target Subjects were the participants in the shooting that took place February 9, 2024, as described above.

23. I have reviewed publicly available information about the infotainment systems resident on the Subject Vehicle and the Target Vehicle. From my review, I have learned that both the Subject and Target Vehicles are equipped with infotainment systems that collect and store significant amounts of data, as detailed further below, including but not limited to system information, information from connected devices (e.g., cellular phones), vehicle events, and extensive geolocation data. As described in detail below, electronic data, information, and images stored on these systems may be successfully extracted from the Subject and Target Vehicles using proprietary hardware and software.

24. Currently, the Subject and Target Vehicles are located at the secured vehicle garage bay at the Saco Police Department located at 20 Storer Street, Saco,

Maine. As detailed above, the Subject and Target Vehicles were seized and searched pursuant to judicially authorized search warrants. Therefore, while law enforcement might already have all necessary authority to examine the infotainment and telematics systems pursuant to the previously executed warrant, I seek this additional warrant out of an abundance of caution.

25. Furthermore, and in addition, I seek authority pursuant to the proposed warrant to perform a gunpowder residue detection sweep of both the Subject and Target Vehicles using a recently obtained forensic examination kit.

### TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

26. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

   a. Many modern motor vehicles are equipped with sensors, cameras,[4] transmitters, and electronic control units (ECUs)[5] to monitor and manage vehicle operations, track vehicle movement, and exchange information

---

[4] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[5] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

with other vehicles and infrastructure.[6] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems

---

[6] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

e. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h. As previously stated, the Subject Vehicle is a green 2023 Honda HR-V, bearing New Hampshire Passenger Car Registration Number 5154753, bearing VIN 3CZRZ2H58PM705896, and the Target Vehicle is a red 2023 Dodge Charger, bearing Maine Registration Number 7120ZM and VIN

  2C3CDXHG0PH566312 (together, the "Vehicles"). To complete a forensic extraction from the Vehicles, it may be necessary, temporarily, to remove trim and other components of the Vehicles to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the Vehicles. In the event that potentially destructive processes are required to perform this extraction, parts of the Vehicles may be destroyed and rendered useless.

i. Furthermore, it may be necessary to return to the Vehicles and reconnect the infotainment and telematics systems to the Vehicles' power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j. The requested warrant authorizes a later review of the media and information seized or copied from the Vehicles, which review may continue past the date required for execution of the warrant.

## CONCLUSION

27. I submit that this affidavit supports probable cause for a warrant authorizing the extraction and forensic examination of electronically stored information within the Vehicles (as described in Attachment A) to seize the data described in Attachment B.

Respectfully submitted,

Ryan P. Hatch
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Feb 16 2024

City and state: Portland, Maine

_Judge's signature_

Karen Frink Wolf, U.S. Magistrate Judge
_Printed name and title_